**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 13-cv-03154-CMA-KMT

CRAZY WILLY'S INC.,

    Plaintiff,

v.

VALLEY FORGE INSURANCE CO., and
CONTINENTAL CASUALTY COMPANY,

    Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Valley Forge Insurance Company's and Continental Casualty Company's (collectively "Defendants'")[1] Motion for Summary Judgment. (Doc. # 28.)

This case arises out of an insurance coverage dispute and concerns whether Defendants breached their contractual duty to Plaintiff when they refused to pay a claim

---

[1] Defendants' Motion notes that Continental Casualty Company is "incorrectly named." In their Answer to Plaintiff's Complaint, Defendants stated that Continental Casualty Company should be dismissed as a party, because it "is not an agent of Valley Forge. Valley Forge is a wholly owned subsidiary of American Casualty Company of Reading, Pa., which is a wholly owned subsidiary of Continental Casualty Company. The reference to CNA in the Complaint is ambiguous and improper. CNA is a trade name used by Continental Casualty Company, Valley Forge and their associated entities; it is not a legal entity that is capable of being sued." (Doc. # 16 at ¶¶ 4, 8.)  However, because this Order dismisses all claims against Continental Casualty Company, the Court need not also dismiss Continental Casualty as a Party.

under a business insurance policy. Plaintiff's Complaint also asserts a claim for the unreasonable denial of a covered benefit under C.R.S. §§ 10-3-1115 and 10-3-1116.

Defendants have established as a matter of law that Plaintiff's claimed loss was not covered under this business insurance policy because the property which was the subject of Plaintiff's claim was not owned by Plaintiff at the time it made a claim under the policy. Consequently, Defendants are entitled to summary judgment on both of Plaintiff's claims.

## I. BACKGROUND

### A. Plaintiff's Claim[2]

Valley Forge issued Commercial Insurance Policy No. 4034615106 ("the Policy") to Plaintiff several years before Plaintiff's alleged covered loss. (Doc. # 28-1 at 7-8.) The Policy was in effect in mid-November of 2011, when the alleged loss occurred. (Doc. # 4 at ¶ 7.)

At the time of the alleged loss, Plaintiff was a franchisee of Halloween Express, L.L.C., a Halloween merchandise retail chain. (Doc. # 28-2 at 10:9-10). Pursuant to its franchise agreement with Halloween Express, Plaintiff owned territorial rights to sell its Halloween merchandise in certain counties in the Denver metropolitan area. (*Id.* at 10:25-11:23)

On June 16, 2011, Plaintiff and its sole shareholder, Jeremy Haster, entered into an Asset Purchase Agreement (the "Purchase Agreement") with Jack's Halloween,

---

[2] The following facts are undisputed. However, because the Court is addressing Defendants' Motion, the Court views the facts in the light most favorable to Plaintiff, the nonmovant. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998). Thus, reasonable inferences are drawn and factual ambiguities are resolved in Plaintiff's favor. *Id.*

L.L.C. ("Jack's Halloween"), another franchisee of Halloween Express, L.L.C., and its owner, Brian Veatch. (Doc. # 28-3.) Plaintiff's Purchase Agreement with Jack's Halloween provided that Plaintiff would sell particular merchandise, equipment, and territorial rights to Jack's Halloween in exchange for periodic payments throughout the year. (*Id.* at 2-3.) The Purchase Agreement consisted of two phases, occurring over the span of two Halloween "seasons." (*Id.*) Under Phase 1, which was to occur in 2011, Plaintiff sold its territorial rights in three of the seven counties it controlled in the South metro Denver area, as well as approximately $135,000 worth of merchandise ("Phase 1 Merchandise.") (Doc. # 28-3 at 2.) Under Phase 2, which was to occur in the 2012 Halloween season, Plaintiff was to sell the rights in the remaining four counties, as well as approximately $180,000 worth of merchandise. (Doc. # 28-3 at 3.)

Plaintiff transferred the Phase 1 Merchandise and territorial rights to Jack's Halloween prior to the 2011 Halloween season, and Jack's Halloween made payments pursuant to the agreement before and during that season, with a final payment under Phase 1 of the Purchase Agreement due November 5, 2011. (*Id.* at 3; *see also* Doc. # 28-2 at 78:6-80:1.)[3] Separate and apart from this purchase from Plaintiff, Jack's Halloween also purchased an estimated $300,000 worth of merchandise from Morris

---

[3] Although the parties did not provide copies of the bill of sale or the security agreement, the Purchase Agreement provides that at closing, with regard to the Phase 1 Merchandise:

> Seller . . . shall [e]xecute the Bill of Sale attached as Exhibit "B" to this agreement.
> * * *
> Buyer . . . shall execute the promissory note and security agreement attached as "Exhibit A" to this agreement.

(Doc. # 28-3.)

3

Costumes.  (Doc. # 28-4 at 23:9-10.)  After the Purchase Agreement was signed, Jack's Halloween took possession and control of the Phase 1 Merchandise and intermingled it with inventory from other vendors, including Morris Costumes, for sale to customers in the three territories that Jack's Halloween had purchased from Plaintiff.  Additionally, it made several periodic payments to Plaintiff.  (*Id.* at 20:4-14, 22:10-23:11.)

After a lackluster 2011 Halloween season, Jack's Halloween could make neither the November 5, 2011 final payment of $200,000 that it owed to Plaintiff, nor the payments due to other vendors, including $205,000 to Morris Costumes.  (*Id.* at 72:10-14; *see also* Doc. # 28-5.)    The merchandise from each of Jack Halloween's three Halloween Express stores – which included both the Phase 1 Merchandise and the merchandise from Morris Costumes – was placed in storage, in three separate trailers, leased to Jack's Halloween.  (Doc. # 28-4 at 68:10-69:12, Doc. # 28-6 at ¶¶ 1-9.)  This stored inventory was worth approximately $400,000.  (Doc. # 28-5 at 3.)  Each trailer was secured with a padlock, and Mr. Veatch had access to the padlock's keys.  (Doc. # 28-4 at 83:10-18.)

In order to allow Jack's Halloween to discharge its debt to Morris Costumes, Mr. Veatch agreed to give Morris Costumes access to the three trailers.  (Doc. # 28-5 at 3.)  In November 2011, Scott Morris represented that he would pay for shipping, storage, and separation of the remaining $400,000 in unsold inventory, and ship Crazy Willy's, Inc. inventory back to it.  (*Id.*; *see also* Doc. # 28-4 at 91:14-93:9.)  On December 2, 2011, Mr. Veatch unlocked the trailers and allowed drivers hired by Scott Morris to transport the trailers to a shipping yard, where all of the inventory was unloaded into

containers and shipped to Morris Costumes' warehouse in North Carolina. (Doc. # 28-4 at 111:7-112:4, 113:21-114:15.)

When the inventory arrived in North Carolina, Morris Costumes separated the merchandise it had sold to Jack's Halloween from that owned by other vendors (including Plaintiff) and forgave the debt owed to it by Jack's Halloween. However, Morris Costumes did not return the other, separated inventory as the parties had originally anticipated. (*Id.*) Rather, Mr. Morris notified both Jack's Halloween and Plaintiff that both parties could pick up the separated merchandise from Morris Costumes' warehouse in North Carolina. (Doc. # 28-4 at 113:21-114:15.) At that point, Plaintiff did not notify Defendants of any alleged loss or submit a theft claim under the Policy. Rather, on January 3, 2012, Plaintiff, through Mr. Haster, notified Jack's Halloween in an email that it viewed the movement of the Phase 1 Merchandise to be a "material breach" of the Purchase Agreement, as Plaintiff was a "creditor" under that Agreement:

> I discovered yesterday that, unknowing [sic] to me, you had transferred 100% of the ending inventory . . . (including nearly $100,000 of my inventory merchandise and 8-10k hooks) in two full semi loads to Morris Costumes on or about 11/30/11. **All the while misleading me to believe that all 3 trailers were still in Prime Trailer's storage yard, just waiting for you to work out a mutually agreeable parting of ways with me and our contract together which included you securing a warehouse where you, me, and Morris reps he'd wish to send out, etc. could inventory and separate the merchandise as amicably as possible for return to their respective parties/creditors** . . . **Transferring my goods without proper notice and approval** by me was a material breach of our Purchase and Sale agreement and its accompanying security agreement. . . . [W]hat appears to be your **willful and misleading effort to disguise from me your transfer of my collateral to a third party vendor** . . . is increasingly appearing as a calculated attempt by you to **defraud a creditor (me)** and I believe I'm entitled to a full explanation.

5

(Doc. # 28-8) (emphasis added).

More than a year later, on April 24, 2012, Plaintiff reached a settlement agreement with Jack's Halloween and Mr. Veatch, whereby each released the other entirely from the Purchase Agreement's obligations. (Doc. # 28-5 at 3-4 and 6.) Additionally, Plaintiff received an assignment of any claims that Jack's Halloween might have against Halloween Express, Scott Morris, and Morris costumes, including, but not limited to, extraneous claims concerning the franchise agreements signed between Jack's Halloween and Halloween Express. (*Id.*) The next day, Plaintiff filed suit in Boulder County District Court against Halloween Express, L.L.C., Morris Costumes, Inc., and Scott Morris, asserting numerous claims, including a claim for conversion, tortious interference with the Purchase Agreement, and civil conspiracy. (Doc. # 28-9 at 17.) This civil action was removed to the United States District Court, District of Colorado, and ultimately submitted to arbitration.

On June 29, 2013, Plaintiff, through Haster, filed a theft report based Scott Morris' transport of the Phase 1 Merchandise to North Carolina. (Doc. # 28-10.) The "Incident/Investigation Report" written by the officer who spoke with Haster states that $106,000 of Halloween Costumes and Decorations were "stolen." The Officer's summary of his discussion with Haster reads, in pertinent part: "Veatch had told [Haster that he] had arranged to have the entire co-mingled inventory returned to his vendor, Morris Costumes in North Carolina. . . . Haster's merchandise was to be returned to him in Colorado. The return of the merchandise never occurred. Haster has contacted

6

both Veatch and Morris in an attempt to have his merchandise returned to him." (*Id.* at 2, 3-4.)

### B. Defendants' Denial of Plaintiff's Theft Claim

On June 30, 2013, Plaintiff initiated a theft claim under the policy in the amount of $106,000, the purported value of the remaining Phase 1 Merchandise, which Plaintiff claimed was "covered property" under its insurance policy with Defendant, and stating that the date of the loss was June 15, 2013 (i.e., the date that Mr. Haster concluded that the remaining Phase 1 Merchandise would not be returned to Plaintiff). (Doc. # 28-11.) After investigating the claim, on August 7, 2013, Defendants advised Plaintiff in a letter (the "Denial Letter") that they would not pay the claim because

> Scott [Morris] has failed to return the goods you sold to Brian [Veatch]. Scott [Morris] was taking back the property due to funds Brian [Veatch] owed to Scott [Morris]. . . . You indicated Scott [Morris] said you could pick up the goods and told you there are 11 skids of goods that you can pick up but has not provided an inventory of those goods. . . . Unfortunately, the policy will not provide coverage to reimburse you for the value of the goods that were shipped to Scott Morris and which he states you can pick up.

(*Id.*) The letter specifically reserved Valley Forge's rights and defenses under the policy or at law. (*Id.*) It also quoted, verbatim, from the Policy, including the Policy's "BUSINESS OWNERS SPECIAL PROPERTY COVERAGE FORM," which provides coverage for business personal property as follows:

### A. COVERAGE

> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.

7

### 1. Covered Property

Covered Property includes Buildings described under **a.** below, Business Personal Property as described under **b.** below, or both, depending on whether a Limit of Insurance is shown in the Declarations for the type of property. Regardless of whether coverage is shown in the Declarations for Buildings, Business Personal Property, or both, there is no coverage for property described under Paragraph **A.2.** Property Not Covered.

. . .

> **b.** **Business Personal Property** located in or on the buildings at the described premises or in the open (or in a vehicle) within 1,000 feet of the described premises, including:
>
>> (1) Property **that you own** that is used in your business;
>> (2) Property of others that is in your care, custody or control;.

\*\*\*

### 3. Covered Causes of Loss
RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
a. Excluded in section B. EXCLUSIONS;
b. Limited in paragraph A.4. Limitations; or
c. Excluded or limited by other provisions of the policy.

## II.  LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing motions for summary judgment, a court must view the evidence in the light most favorable to the

8

non-moving party. *Id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

### III. ANALYSIS

Summary judgment in favor of Defendants is warranted here because the Phase 1 Merchandise was not "covered property" under the Policy.

Under Colorado law,[4] an insurance policy is merely a contract that courts should interpret in line with well-settled principles of contract interpretation. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003). As an overarching principle, in construing a contract courts must also "consider the subject matter, the object of making it, the sense in which the parties naturally understood it at the time it was made, and the purposes and objects to be accomplished thereby." *Total Petroleum, Inc. v. Farrar*, 787 P.2d 164, 167 (Colo.1990) (quotation and alteration marks omitted).

In undertaking the interpretation of an insurance contract, the Colorado Supreme Court has warned that courts should be wary of rewriting provisions, and should give the words contained in the contract their plain and ordinary meaning, unless contrary intent is evidenced in the policy. *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613 (Colo. 1999). Additionally, courts may neither add provisions to extend coverage beyond that contracted for, nor delete them to limit coverage, though they do construe ambiguous provisions against the insurer and in favor of providing coverage to the insured. *Cyprus Amax Minerals Co.*, 74 P.3d at 299. An insurance contract is ambiguous if it is "fairly susceptible" to more than one interpretation. *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008) (applying Colorado law).

---

[4] In this diversity case, the Court applies Colorado law and interprets the Policy as a Colorado court would. *Farmington Cas. Co. v. Duggan*, 417 F.3d 1141, 1142 (10th Cir. 2005). The parties do not dispute that Colorado law applies, and the Policy does not contain a choice of law clause.

As a preliminary matter, it bears mention that much of Plaintiff's opposition to Defendant's Motion rests on an erroneous legal assumption. Plaintiff asserts that "Under Colorado law, when an insurer denies coverage on specific grounds, it waives the right to later add additional defenses to coverage, including lack of timely notice." (Doc. # 32 at 3-4.) In particular, Plaintiff states that, in their Denial Letter, Defendants did not raise particular exclusions, and thus, "Defendant waived these claims [i.e., the exclusions] now being advanced." In support of this argument, Plaintiff cites a single case, *Flat Iron Paving Co. v. Great West Fire Ins. Co.*, 812 P.2d 668, 671 (Colo. App. 1990) (superseded by statute as recognized in *Brodeur v. Am. Home Assur. Co.*, 169 P.3d 139, 148 n. 10 (Colo. 2007)). *Flat Iron Paving Co.*, however, stands for a much more limited proposition than Plaintiff indicates – namely, that an insurer waives its right to contest **damages and a lack-of-notice defense** when it denies coverage:

> [The insurer] was notified by [the insured] ten days after the [loss event], and four days later denied coverage. . . . [the insured] was advised that, absent reimbursement, a lawsuit would be filed. Relying on its interpretation of the policy, [the insurer] did nothing. Therefore, . . . [the insurer] '**waived its right to assert failure to timely forward suit papers as a defense** because it denied liability on the basis of coverage only and **did not assert the notice defense until judgment was entered against its insured** and this . . . action was instituted.' . . . Absent fraud or collusion, by refusing coverage, [the insurer] **waived its right to contest the liability of [the insured] with respect to the matters on which it was sued and the amount of** . . . **damages**.

*Id.* (emphasis added). In any case, as Defendants correctly note, Plaintiff's argument is contrary to Colorado law. It is "well established" that "the doctrines of implied waiver and of estoppel, based upon the conduct or action of the insurer, **are not available to bring within the coverage of a policy risks not covered by its terms, or risks**

11

**expressly excluded therefrom.**" *McGowan v. State Farm Fire & Cas. Co.*, 100 P.3d 521, 526 (Colo. App. 2004) (emphasis added) (quoting *Empire Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 764 P.2d 1191, 1198 (Colo. 1988)); *see also Hartford Live Stock Ins. Co. v. Phillips*, 150 Colo. 349, 372 P.2d 740, 742 (1962) (same).

With these background principles in mind, the Court analyzes why the Policy did not provide coverage here.

### A. The Subject Merchandise Was Not "Covered Property"

An insured party bears the burden to show that a loss falls within the limits of the insurance contract's coverage. *Colo. Intergovernmental Risk Sharing Agency v. Northfield Ins. Co.*, 207 P.3d 839, 842 (Colo. App. 2008) (citing 7 Couch on Insurance § 101:60 (3d ed. 2006)). In relevant part, the Policy defines "covered property" as that "business personal property . . . that **you own** that is used in your business," or "property of others that is in your care, custody or control." (Doc. # 28-1 at 9.)

Plaintiff argues that it actually retained legal ownership over the Phase 1 Merchandise by virtue of a security agreement that was executed as part of the Purchase Agreement; however, this argument is misplaced. It is undisputed that Plaintiff sold the Phase 1 Merchandise to Jack's Halloween, well before the date of its loss by Morris Costumes – and thus, Plaintiff did not "own" the property as was required by the Policy. The Purchase Agreement contains no language indicating that Plaintiff retained ownership of any kind over the Phase 1 Merchandise until Jack's Halloween paid in full. Rather, in signing the Purchase Agreement and exchanging the bill of sale, Plaintiff's status vis-a-vis the Phase 1 Merchandise changed. Plaintiff had owned the

Phase 1 Merchandise prior to execution of the Purchase Agreement. However, after the execution of the Purchase Agreement, Plaintiff retained neither ownership nor possession of the Phase 1 Merchandise. Plaintiff was transformed from an owner of the Phase 1 Merchandise to a creditor with only a security interest in the Phase 1 Merchandise. That Plaintiff sold its merchandise to Jack's Costume and that Jack's Costume did not pay in full (and in the process, allowed Morris Costumes to improperly dispose of its own valuable inventory, intentionally or not) allows Plaintiff to bring a **breach of contract claim** against **Jack's Costumes** (which, notably, Plaintiff has already brought). But it does not necessarily follow that these facts justify a breach of insurance contract claim against **Defendants.**

In sum, the Subject Merchandise was not "covered property" under the Policy.[5]

### B. <u>Plaintiff's Improper Denial of Benefits Claim Fails As A Matter of Law</u>

Plaintiff's claim was not recoverable under this policy, because, as described above, the Phase 1 Merchandise was not covered property. Accordingly, Plaintiff cannot maintain an action for improper delay or denial of benefits under C.R.S. §§ 10-3-1115 or 10-3-1116, as the express language of C.R.S. § 10-3-1115 applies only when benefits are "owed to" a claimant, and C.R.S. § 10-3-1116 applies to "covered benefit[s]" only. To put it differently, to succeed on this claim, a plaintiff must "prove that payment of an insurance **covered benefit** was unreasonably delayed or denied."

---

[5] Defendants also argue that three of the Policy's exclusions – "Dishonesty," "False Pretense," and "Transfer of Property" – preclude coverage here. These exclusions were specifically cited in Defendants' Denial Letter (Doc. # 28-11.) Because Plaintiff did not own the Phase 1 Merchandise at the time it was transferred to North Carolina, the Court need not address the Policy's exclusions here.

*Hansen v. Am. Family Mut. Ins. Co.*, 2013 COA 173, ¶ 55 (emphasis added).  Because the undisputed facts demonstrate that Plaintiff's claim was not covered under the Policy, Plaintiff cannot establish that Defendants unreasonably delayed or denied the claim or that, in doing so, they acted unreasonably or with reckless disregard.  Accordingly, summary judgment in Defendant's favor on Plaintiffs' bad faith claim is appropriate.

## IV.  CONCLUSION

Based on the foregoing, the Court ORDERS that Defendants' Motion for Summary Judgment (Doc. # 28) is GRANTED.  It is

FURTHER ORDERED that Defendant shall have its costs by the filing of a Bill of Costs with the Clerk of the Court within 10 days of the entry of judgment.  It is

FURTHER ORDERED that the four-day jury trial, set to commence on June 15, 2015 is VACATED, as is the Final Trial Preparation Conference, set for May 29, 2015.  Finally, it is

FURTHER ORDERED that this case is DISMISSED in its entirety.

DATED:  March 2, 2015

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge